UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANTANDER CONSUMER USA
INC. and DRIVE TRADEMARK
HOLDINGS, LP,
     Plaintiffs,


     v.                                CIVIL ACTION NO.
                                          08-11778-MBB

MARK WALSH, INOFIN, INC,
DRIVE USA 1, INC.
DRIVE USA 2, INC.
DRIVE USA 3, INC. and
DRIVE USA 4, INC.,
     Defendants.


**MEMORANDUM AND ORDER RE:
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY
# 37); AND PLAINTIFFS' MOTION FOR JUDGMENT ON THE
PLEADINGS UNDER FRCP 12(C) AND MOTION TO
STRIKE DEFENDANTS' COUNTERCLAIMS
(DOCKET ENTRY # 34)**

**November 30, 2010**


**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment filed by defendants Drive USA 1, Inc., Drive USA 2, Inc., Drive USA 3, Inc. and Drive USA 4, Inc. ("Drive USA defendants" or "the Drive USA companies"),[1] Mark Walsh ("Walsh"), President of Drive USA, and Inofin, Inc. ("Inofin"), a Massachusetts corporation

---

[1] The Drive USA companies are Massachusetts corporations with principal places of business in Massachusetts except for Drive USA 3, a Rhode Island corporation with a principal place of business in Providence.

with a principal place of business in Rockland, Massachusetts
(collectively: "defendants"). (Docket Entry # 37). Defendants
seek summary judgment in this trademark infringement action on
all counts in the complaint as well as on Count II of a
counterclaim for declaratory relief. Plaintiffs Santander
Consumer USA Inc. ("Santander"), formerly known as Drive
Financial Services, LP, and Drive Trademark Holdings LP ("DTH")
(collectively: "plaintiffs"), both having principal places of
business in Texas, move for judgment on the pleadings under Rule
12(c), Fed. R. Civ. P. ("Rule 12(c)"), on counts I, III and IV in
the counterclaim. They also move to strike the declaratory
judgment count in the counterclaim under Rule 12(f), Fed. R. Civ.
P. ("Rule 12(f)"). (Docket Entry # 34). After conducting a
hearing, this court took the motions (Docket Entry ## 34 & 37)
under advisement.


PROCEDURAL BACKGROUND

Plaintiffs filed this action in October 2008. The five
count complaint sets out trademark infringement, false
designation of origin, unfair competition and trademark dilution
claims under the Lanham Act, 15 U.S.C. §§ 1051 et seq. ("the
Lanham Act"), in counts II and III and V. Count IV consists of
claims for trademark infringement and unfair competition under

Massachusetts statutory and common law.[2]  In addition to the
Lanham Act claims under sections 43(a) and 32, Count V includes a
claim that defendants violated Massachusetts General Laws chapter
93A, section 11 ("chapter 93A").  The count also contains claims
for trademark dilution under the Texas Anti-Dilution Statute
codified in section 16.29 of the Texas Business and Commerce Code
("section 16.29") and section 13 of Massachusetts General Laws
chapter 110H ("chapter 110H").[3]  Finally, Count I seeks
declaratory relief under the Lanham Act.

In February 2009, defendants filed a four count
counterclaim.  Count I is a fraudulent procurement claim under
the Lanham Act, 15 U.S.C. § 1120 ("section 1120").  Count II
seeks declaratory relief under the Lanham Act.  In Count III,
defendants allege federal antitrust violations under the Sherman
Antitrust Act, 15 U.S.C. §§ 1-7 ("the Sherman Act"), on the basis
of plaintiffs' monopolistic and anticompetitive trademarks.
Count IV alleges a chapter 93A violation.

---

[2]  The caption of the count reflects only "common law"
claims whereas the body of the count refers to a "violation of
the common and statutory law of Massachusetts" without
identifying the applicable statute.

[3]  Count V does not cite the Federal Trademark Dilution Act
of 1995, 15 U.S.C. § 1125(c) ("section 1125(c)" or "the FTDA").
It only cites to the Lanham Act, 15 U.S.C. § 1125(a).  Hence, the
dilution claims in Count V are based on state law.

## THE TRADEMARKS

Plaintiffs' trademarks, all registered, consist of the following:  (1) registration number 2,503,943 ("registration 943"), which issued on November 6, 2001, for the mark DRIVE with a stylized D above the letter "V" for "financial services, namely, purchasing loans from automobile dealerships"; (2) registration number 2,503,946 ("registration 946"), which issued on November 6, 2001, for the mark D in a stylized format in relation to "financial services, namely, purchasing loans from automobile dealerships"; (3) registration number 2,514,867 ("registration 867"), which issued on December 4, 2001, for the mark DRIVE FINANCIAL SERVICES with financial services appearing underneath drive in a smaller typeset and a different font coupled with a stylized D appearing above the letter "V" in drive all in relation to "financial services, namely, purchasing loans from automobile dealerships"; (4) registration number 3,081,414 ("registration 414"), which issued on April 16, 2006, for the mark DRIVE FINANCIAL SERVICES in plain text for "financial services, namely, originating loans, purchasing loans and servicing auto loans"; and (5) registration number 3,081,262 ("registration 262"), which issued on April 18, 2006, for the mark DRIVE in plain text for "financial services, namely, originating loans, purchasing loans and servicing auto loans" (collectively:  "the Drive Marks") (Docket Entry ## 16 & 21, ¶¶

4; Docket Entry # 1, Ex. 1).

Registrations 414 and 262 designate first use in 1999 whereas the remaining three registrations designate first use in 2000. The filing dates of registrations 414 and 262 are respectively March 10, 2005, and August 26, 2004. The applications leading to registration numbers 414 and 262 include declarations by DTH that, to the best of its knowledge and belief, no other person or corporation had the right to use the service marks in commerce in relation to automobile financial services. Registration 414 disclaims exclusive rights to the phrase financial services apart from the mark itself, i.e., DRIVE FINANCIAL SERVICES.

On July 2, 2004, Inofin filed application serial number 78445657 ("application 657") in the PTO directed to the mark DriveUSA for financing services, auto loans, vehicle loans and related services relative to international class 036, the same class as the Drive Marks. The application sought registration in additional classes for automobile related services.[4] An amendment to the application identifies the first use of the mark as July 27, 2004. Inofin subsequently executed and recorded with the PTO an assignment of application 657 to Walsh.

The July 2004 filing date for application 657 precedes the

_____

[4] In allowing a later motion to divide filed by Inofin, the PTO divided out the additional classes from the application for international class 036.

March 2005 filing date of the application that led to
registration 414 for the DRIVE FINANCIAL SERVICES mark.  The July
2004 filing date for application 657 also precedes the August
2004 filing date of the application that led to registration 262
for the DRIVE mark.

Litigation ensued in the Trial and Trademark Appeal Board of
the United States Patent and Trademark Office ("TTAB") when DTH
opposed application 657 for international class 036.  Plaintiffs
also instituted suit against defendants in the United States
District Court for the Northern District of Texas ("the Texas
court").  (Docket Entry # 46, Ex. 3, ¶ 4).


I.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 37)

In seeking summary judgment, defendants submit there is an
absence of a likelihood of confusion between the DriveUSA mark
and the Drive Marks.  According to defendants, the absence
forecloses relief on the federal and common law trademark
infringement claims in counts II and IV, the federal, state and
common law unfair competition claims in counts IV and V, the
assertion of willful infringement and the false designation of
origin claim in Count III.

In addition to dismissing the declaratory relief sought in
Count I, defendants move for summary judgment on Count II of the
counterclaim and seek a declaration that registrations 414 and

262 are invalid because the term drive is descriptive which, coupled with the disclaimed rights for financial services, is not entitled to trademark protection.  They further maintain that the descriptive Drive Marks in these registrations lack secondary meaning.  Accordingly, they are not subject to trademark protection.

As a final argument, defendants contend that the Drive Marks are neither famous nor distinctive and there is no likelihood of dilution.  Accordingly, defendants move for summary judgment on the trademark dilution claims under Texas and Massachusetts law in Count V.

## STANDARD OF REVIEW

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  <u>Davila v. Corporacion De Puerto Rico Para La Difusion Publica</u>, 498 F.3d 9, 12 (1st Cir. 2007).  It is appropriate when the summary judgment record shows "there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  <u>American Steel Erectors, Inc. v. Local Union No. 7, International Association of Bridge, Structural,</u>

Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Id.

DISCUSSION

A. Likelihood of Confusion

Defendants devote the majority of their arguments to the absence of a likelihood of confusion. Likelihood of confusion is an essential element of a trademark infringement claim under the Lanham Act. See Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008) ("[t]o succeed on a claim of trademark infringement, a plaintiff must establish . . . that the allegedly infringing use is likely to cause consumer confusion"). The same likelihood of confusion standard applies to the unfair competition and false designation of origin claims. See Venture Tape Corp. v. McGills Glass Warehouse, 540 F.3d 56, 61 n.6 (1st Cir. 2008) ("Venture's unfair competition claim (Count 2) and false designation claim (Count 3) are subject to the same legal standard--namely, 'likelihood of confusion'--as its Count 1 infringement claim"). To survive summary judgment, plaintiffs must show "a substantial likelihood of confusion." Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8, 18 (1st Cir. 2004) ("Beacon Mutual acknowledges that it must demonstrate a substantial likelihood of confusion to survive summary

judgment"). The summary judgment inquiry therefore turns upon whether a "reasonable factfinder could find a substantial likelihood of confusion." <u>Id.</u> at 18.

The confusion must "'exist in the mind of a relevant person.'" <u>Id.</u> at 10. The relevant person is not only the actual or the potential buyer of the product. <u>Id.</u> at 16 ("likelihood of confusion inquiry is not limited to actual or potential purchasers, but also includes others whose confusion threatens the trademark owner's commercial interest in its mark"). Rather, it includes "the minds of persons in a position to influence the purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner." <u>Id.</u> at 10. As such, the relevant persons include the individuals at the dealerships suggesting or initiating the financing as well as the automobile purchasers at the dealerships purchasing the financing.

The non-exclusive list of factors to assess likelihood of confusion under section 43(a) of the Lanham Act is:

> (1) the similarity of the marks; (2) the similarity of the goods (or, in a service mark case, the services); (3) the relationship between the parties' channels of trade; (4) the juxtaposition of their advertising; (5) the classes of prospective purchasers; (6) the evidence of actual confusion; (7) the defendant's intent in adopting its allegedly infringing mark; and (8) the strength of the plaintiff's mark.

<u>The Shell Co. (Puerto Rico) Ltd. v. Los Frailes Service Station, Inc.</u>, 605 F.3d 10, 22 & n.9 (1ˢᵗ Cir. 2010); <u>accord</u> <u>Venture Tape</u>

Corp. v. McGills Glass Warehouse, 540 F.3d at 60 (citing these factors). The inquiry is "highly fact-intensive." The Shell Co. (Puerto Rico) Ltd. v. Los Frailes Service Station, Inc., 605 F.3d at 22 ("application of those factors to the record is a highly fact-intensive inquiry").

"[S]imilarity is determined on the basis of the designation's total effect." International Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing Center, 103 F.3d 196, 203 (1st Cir. 1996); accord Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d at 18 (similarity "factor is evaluated based on the 'the designation's total effect'"). More specifically, the inquiry turns upon the total effect examining the similarity "in sound, appearance, and meaning." Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 817 (1st Cir. 1987); accord Recot, Inc. v. Becton, 214 F.3d 1322, 1329 (Fed.Cir. 2000) ("similarity or dissimilarity of the marks in their entirety is to be considered with respect to appearance, sound, and connotation").

In the case at bar, the overall appearances of the marks are somewhat similar. With the exception of the marks in registrations 946 and 414, the Drive Marks and the DriveUSA mark use larger and smaller fonts to emphasize the prominent portions which also overlap. Although the overall impressions both conjure strong and emphatic statements, the sight, sound and

appearance of the more succinct "D" and the drive in the Drive

Marks convey a stronger, more emphatic sound, sight and

appearance than the DriveUSA mark.  While this court recognizes

that the ultimate determination is the total effect, a jury could

readily find that the common portion of the marks, to wit, drive,

is weak.  See 4 Thomas McCarthy, McCarthy on Trademarks and

Unfair Competition §§ 23.48 & 23.39 (4th ed. 2008) (if "common

element of conflicting marks is a word that is 'weak' then this

reduces the likelihood of confusion" and portion of "mark may be

'weak' in the sense that such portion is descriptive, highly

suggestive, or is in common use by many other sellers in the

market"); see also Boston Duck Tours, LP v. Super Duck Tours,

LLC, 531 F.3d at 24.  On balance, a reasonable jury could find

the total effect of the DriveUSA mark similar to the Drive Marks

in registrations 414, 262, 867 and 943.[5]

Examining the relevant factors and viewing the record in

plaintiffs' favor, both parties provide services for dealer

originated subprime financing for automobiles.[6]  On the other

hand, defendants also sell, repair and maintain automobiles and

---

[5]  The total effect of the singular stylized "D" mark in
registration 946 is not similar to the DriveUSA mark.

[6]  Whether defendants engage in subprime automobile
financing is a genuine issue of material fact.  Although
defendants dispute their involvement, the record provides
sufficient evidence for a jury to find in plaintiffs' favor.

operate automobile dealerships.  The services are by no means
identical but there is sufficient overlap and relatedness of the
parties' services to generate confusion.  See Volkswagenwerk
Aktiengesellschaft v. Wheeler, 814 F.2d at 818; see also Beacon
Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d at 19
(paraphrasing Wheeler in parenthetical as "finding similarity of
goods and services between a shop specializing in Volkswagen
repair and distributors that both sold and repaired
Volkswagens").

   The channels of trade, advertising and classes of
prospective purchasers similarly allow a reasonable jury to find
in plaintiffs' favor.  The factual evidence, however, weighs in
defendants' favor on these factors but nonetheless provides some
evidence indicative of a likelihood of confusion.  Walsh, the
owner of the Drive USA companies since September 2005, had
automobile dealerships in Springfield and Raynham, Massachusetts
and one in Providence, Rhode Island, at the time of a February
2008 deposition.[7]  The dealerships sell new and used automobiles
and initiate loans which Inofin, a subprime automobile finance

---

   [7]  Walsh was thinking about adding a fourth dealership in
Worcester, Massachusetts at the time of the deposition.  In or
around January 2010, a screenshot from the DriveUSA website
evidences dealerships in Springfield and Providence and the move
of the Raynham dealership to the Providence location.  The
screenshot also notes the opening of the Worcester dealership in
the fall of 2010.

company, may then purchase.  Defendants undeniably provide
significant other services and goods beyond dealer originated
subprime automobile financing.

Plaintiffs are a leading provider of automobile finance
programs and, beginning in 1999 and 2000, began using the Drive
Marks in connection with subprime financing services.  Automobile
dealers enter into dealer retail agreements ("dealer partners")
with Santander and then communicate plaintiffs' financing
services to consumers, including those located in Massachusetts
and Rhode Island.  A reasonable jury could find that the amount
of care used by the relevant person purchasing subprime financing
for an automobile is far less than the care used by the same
person in deciding which automobile to purchase.  Both plaintiffs
and defendant advertise their respective marks on the internet.
Using their marks, plaintiffs and defendants participate in the
market of dealer generated subprime financing of automobile
purchases.  For example, defendants' internet advertisements
include hyperlinks to complete an application for financing and
note, "We are experts in the subprime market and really can help
you purchase and finance a quality vehicle regardless of your
credit."  (Docket Entry # 46, Ex. 1-12b).  Defendants also use
the DriveUSA mark in print, radio, television and other
advertising media.  The classes of prospective purchasers as well
as the channels of trade overlap albeit not to the degree or lack

of degree asserted by either party.

The evidence of actual confusion, including the affidavit of Scott Joscelyn, strongly favors defendants.  Furthermore, evidence of actual confusion is oftentimes "considered the most persuasive evidence of likelihood of confusion because past confusion is frequently a strong indicator of future confusion." Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d at 18. "[A]ctual confusion is not a prerequisite to a finding of likelihood of confusion," Visible Systems Corp. v. Unisys Corp., 551 F.3d 65, 74 (1st Cir. 2008), however, and a consideration of all of the factors and the factual record as a whole record leads to a denial of summary judgment.  As to the seventh factor, there is little, if any, evidence of bad faith in adopting the DriveUSA mark.

The eighth factor of the strength of plaintiffs' marks entails assessing "'the length of time the mark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark.'"  Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d at 19.  The Drive Marks are reasonably strong.  In use since as early as 1999, plaintiffs have invested significant funds to promote the Drive Marks although there is little to indicate that the investment is targeted towards the Massachusetts and Rhode Island markets.  The Drive Marks are widespread in the field of dealer originated

14

subprime automobile financing.  Plaintiffs promote the marks through internet websites, newsletters to dealerships, presence at trade shows, sponsorships of a nationally televised golf tournament and sponsorships of charity events.  Plaintiffs also employ sales manager throughout the United States.  Plaintiffs therefore engage in significant efforts to promote the Drive Marks.

In conclusion, assessing and weighing all of the relevant factors, summary judgment in defendants' favor on likelihood of confusion is not appropriate.[8]

B.  <u>Trademark Protection</u>

Defendants next maintain that the term drive is merely a descriptive term that lacks secondary meaning and therefore trademark protection.  "Descriptive marks are those that convey an immediate idea of the ingredients, qualities or characteristics of the goods" or services to which they are attached."  <u>Boston Duck Tours, LP v. Super Duck Tours, LLC</u>, 531 F.3d at 13 (internal quotation marks and brackets omitted).  Descriptive marks receive trademark protection only with secondary meaning.  <u>See</u> <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 768-769 (1992); <u>Boston Duck Tours, LP v. Super Duck</u>

---

[8]  This conclusion remains the same even considering the third party registrations of marks with the term drive.

Tours, LLC, 531 F.3d at 13; Boston Beer Co. Ltd. Partnership v.

Slesar Bros. Brewing Co., Inc., 9 F.3d 175, 180 (1st Cir. 1993).

For purposes of summary judgment *only*, this court assumes

that the Drive Marks are descriptive. There is nonetheless

sufficient evidence of secondary meaning to allow a reasonable

jury to find in plaintiffs' favor.[9]

"A mark is entitled to trademark protection if it is capable

of functioning as a source-identifier of goods." Boston Duck

Tours, LP v. Super Duck Tours, LLC, 531 F.3d at 12. For purposes

of summary judgment, this court assumes that the Drive Marks

convey an immediate idea of the ingredients, qualities or

characteristics of the service, see id. at 13, in this instance

dealer originated subprime *automobile* financing.[10] To avoid

summary judgment therefore requires plaintiffs to make a

sufficient showing of secondary meaning. See Two Pesos, Inc. v.

---

[9] In order to deny summary judgment, it is likewise not necessary to find that the Drive Marks are either suggestive or arbitrary even though such a finding would inevitably lead to a rejection of defendants' argument. As long as sufficient evidence exists to allow a jury to find secondary meaning, the presence or absence of a finding that the marks are suggestive or arbitrary would not change the result.

[10] This finding, made solely to resolve the summary judgment motion, does not foreclose a later argument that the marks are suggestive as requiring imagination and thought to identify the source as plaintiffs' dealer originated subprime automobile *financing*.

Taco Cabana, Inc., 505 U.S. at 768-769; Borinquen Biscuit v. M.V. Trading Corp., 443 F.3d 112, 116-118 (1st Cir. 2006); 2 J. Thomas McCarthy McCarthy on Trademarks and Unfair Competition § 1533 (4th ed. 2008). In order to find secondary meaning, the public must not only associate the marks with automobile financing "but also with a single commercial source." Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d at 13.

The plaintiff bears "the burden of proving that secondary meaning has attached within the relevant class of consumers." Flynn v. AK Peters, Ltd., 377 F.3d 13, 19 (1st Cir. 2004) (establishing "'secondary meaning in a word is an issue of fact'" and the party "seeking protection for a mark bears the burden of proving that secondary meaning has attached within the relevant class of consumers"); see generally Peoples Federal Savings Bank v. People's United Bank, 2010 WL 3167549, *5 (D.Mass. Aug. 9, 2010) (quoting Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co., Inc., 9 F.3d at 181). In discharging this burden, the plaintiff may use "direct evidence, such as consumer surveys or testimony from consumers, or" circumstantial evidence. Id. at 20.

Secondary meaning customarily entails "weigh[ing] a number of factors." I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 42 (1st Cir. 1998). In addition to direct evidence of customer copying, factors include "(1) the length or exclusivity of use of

a mark; (2) the size or prominence of the plaintiff's enterprise; (3) the existence of substantial advertising by plaintiff; (4) the products established place in the market; and (5) proof of intentional copying." Bay State Sav. Bank v. Baystate Financial Services, LLC, 484 F.Supp.2d 205, 214 (D.Mass. 2007) (citing I.P. Lund Trading v. Kohler Co., 163 F.3d at 42).

Examining the factors in the case at bar and viewing the facts in plaintiffs' favor, plaintiffs have used the marks in registrations 414 and 262 since 1999 as a means to distinguish their automobile financing services in the dealer originated subprime market. Plaintiffs have used the other marks since 2000. Indeed, plaintiffs use the Drive Marks in virtually all marketing efforts aimed at automobile dealerships, consumers who purchase automobiles using plaintiffs' financing services and consumers visiting industry trade shows.

Plaintiffs have a prominent enterprise. Approximately 10,500 dealer partners in 49 states, including Massachusetts and Rhode Island, actively communicate plaintiffs' financial services to consumers with materials that contain the Drive Marks. Plaintiffs have 25 dealer partners in Rhode Island, where defendants have a dealership. In Raynham, Massachusetts, where defendants formerly had a dealership, eight dealers partner with plaintiffs. Plaintiffs have ten dealer partners in the Springfield area and four dealer partners in Worcester where

defendants anticipate opening a dealership in the fall 2010. In addition, "many dealers select the subprime automobile finance company that will originate the auto loans . . . based primarily on the dealer's profitability on the proposed sale" and plaintiffs are a leading provider of subprime automobile financing programs. (Docket Entry # 46, Ex. 1).

Plaintiffs continue to market themselves using the Drive Marks in statement stuffers in consumer billing statements. These inserts prominently feature a Drive Mark and identify plaintiffs as the single source.

From 2000 to 2004, plaintiffs expended at least $3.6 million, albeit not broken down geographically, to market and advertise their brand, which includes the Drive Marks. Plaintiffs publish two quarterly newsletters to dealer partners and employ sale managers in Massachusetts and Rhode Island. Santander's Communications Director details additional efforts which, along with the foregoing, provide circumstantial evidence that the Drive Marks have acquired secondary meaning.

On the other hand, there is little if any showing of intentional copying. Although consumer surveys and other direct evidence is lacking, the record is sufficient to avoid summary judgment on secondary meaning. See O.C. White Co. v. Scientific Technology Electronic Products, Inc., 2005 WL 3242358, *5 (D.Mass. Nov. 10, 2005) ("so long as 'facts are at issue that

could cause a reasonable jury to decide the mark is a descriptive mark with secondary meaning or a suggestive mark, then the mark would be protected by trademark law and summary judgment for Defendant . . . would be improper'"); see generally Borinquen Biscuit v. M.V. Trading Corp., 443 F.3d at 118 n.4 (noting that direct evidence, such as consumers surveys, is not "an absolute prerequisite" to establish trademark protection).

The summary judgment motion also seeks a declaration to disclaim the term drive from registrations 943 and 867 as requested in Count II of the counterclaim. "[T]he PTO requires disclaimers only for generic and other unregisterable elements in a composite mark." Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d at 24 (citing 15 U.S.C. § 1056(a)). Thus, if the drive component of registrations 867 or 943 is merely descriptive without a secondary meaning, it is the proper subject of a disclaimer. As explained above, there is sufficient evidence of secondary meaning to allow a reasonable jury to find in plaintiffs' favor.

Defendants' argument that the absence of likelihood of confusion warrants summary judgment on the willful infringement claim (Docket Entry # 1, ¶¶ 82-83) is also unavailing for previously stated reasons. Moreover, defendants only reference willful infringement in the conclusion of the supporting

memorandum.  See LR. 7.1.; see also Higgins v. New Balance

Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("district

court is free to disregard arguments that are not adequately

developed").

C.  Dilution Claims

As a final argument, defendants maintain that the Drive

Marks are neither famous nor distinctive.  Defendants further

submit that plaintiffs fail to show a likelihood of dilution.

Accordingly, defendants seek summary judgment on the trademark

dilution claims under Texas and Massachusetts law in Count V.[11]

In order to succeed on a dilution claim under the Texas

statute, section 16.29, the plaintiff "must show that it owns a

distinctive mark and that there is a likelihood of dilution."[12]

E. & J. Gallo Winery v. Spider Webs Ltd., 286 F.3d 270, 278 (5th

Cir. 2002); see generally Scott Fetzer Co. v. House of Vacuums

Inc., 381 F.3d 477, 489 (5th Cir. 2004) (trademark dilution

consists of a "weakening of the ability of a mark to clearly and

unmistakably distinguish the source of a product").  Unlike the

---

[11]  Although defendants cite to section 1125(c)(3) of the
FTDA, the complaint does not cite section 1125(c).  See fn. 3.

[12]  The statute expressly allows a person with a registered
mark to bring a dilution claim "regardless of whether there is
competition between the parties or confusion as to source of
goods or services."  Tex. Bus. & Commerce Code Ann. 16.29.

FTDA, section 16.29 "explicitly requires only distinctiveness, not fame." Advantage Rent-A-Car, Inc. v. Enter. Rent-A-Car Co., 238 F.3d 378, 381 (5th Cir. 2001); cf. I.P. Lund Trading ApS v. Kohler Co., 163 F.3d at 46) ("FTDA grants protection only to famous marks").

In order to determine whether a mark is distinctive under section 16.29:

> the court considers factors much like those used in the FTDA fame analysis: whether the mark is arbitrary, the length of time the user has employed the mark, the scope of the user's advertising and promotions, the nature and extent of the first user's business, and the scope of the first user's reputation . . . A somewhat stricter standard is to be applied in determining "strength" in dilution analysis than in likelihood of confusion analysis.

Advantage Rent-A-Car, Inc. v. Enter. Rent-A-Car Co., 238 F.3d at 381 (internal citations, quotation marks and brackets omitted). Viewing the summary judgment record in plaintiffs' favor, a reasonable jury could find that the Drive Marks are distinctive. In particular, a jury could find that the Drive Marks are strong. Plaintiffs have used the Drive Marks for at least ten years. They advertise nationwide including in the Rhode Island and Massachusetts area using a variety of media. Plaintiffs also have numerous dealer partners in these states that promote the Drive Marks. A jury could also find that plaintiffs' reputation is

widespread.  Plaintiffs' long and extensive use of the Drive

Marks together with their advertising and promotional efforts and

reputation provide sufficient support to classify the marks as

distinctive under section 16.29.  See, e.g., Pebble Beach Co. v.

Tour 18 I, Ltd., 942 F.Supp. 1513, 1565 (S.D.Tex. 1996)

("plaintiff's long and extensive use of the marks, their national

reputations, and their advertising and promotional efforts"

provided basis for court to find the marks distinctive).

Turning to the dilution inquiry, section 16.29 does not

require a showing of actual dilution.  Scott Fetzer Co. v. House

of Vacuums Inc., 381 F.3d at 490 n.9 ("district court erroneously

held that [section 16.29] requires a showing of actual

dilution").  Rather, it requires the plaintiff to "establish 'an

act likely to injure a business reputation or to dilute the

distinctive quality of a mark.'"  Id.

"Dilution may occur through blurring or tarnishing." Id.,

381 F.3d at 489; accord Express One Intern., Inc. v. Steinbeck,

53 S.W.3d 895, 899 (Tex.App.Ct. 2001) (same).  Blurring is "'a

diminution in the uniqueness or individuality of the mark.'"[13]  E.

---

[13]  The complaint alleges the defendants' use of the
DriveUSA mark "dilutes the distinctive quality of one or more of
the Drive Marks by blurring."  (Docket Entry # 1, ¶ 55).

& J. Gallo Winery v. Spider Webs Ltd., 286 F.3d at 279; accord
BDO Seidman LLP v. Alliantgroup, L.P., 2009 WL 1322555, *10
(S.D.Tex. May 11, 2009) (same).  Tarnishing is "'an injury
resulting from another's use of the mark in a manner that
tarnishes or appropriates the goodwill and reputation associated
with the plaintiff's mark.'"  E. & J. Gallo Winery v. Spider
Webs Ltd., 286 F.3d at 279; accord BDO Seidman LLP v.
Alliantgroup, L.P., 2009 WL 1322555, *10 (S.D.Tex. May 11, 2009)
(same).  In the event "the plaintiff holds a distinctive mark,
'it is enough for dilution that the defendant has made
significant use of a very similar mark.'"  Horseshoe Bay Resort
Sales Co. v. Lake Lyndon B. Johnson Imp. Corp., 53 S.W.3d 799,
812 (Tex.App.Ct. 2001).

A reasonable jury could find that the DriveUSA mark is very
similar to the Drive Marks depicted in registrations 262, 943 and
867.  The summary judgment record also supports a finding that
defendants' use of the similar Drive USA mark in internet
advertising and elsewhere in Rhode Island and Massachusetts is
significant.  Accordingly, defendants' arguments do not warrant
summary judgment on the section 16.29 claim in Count V.

Turning to the Massachusetts anti-dilution statute, it
requires the plaintiff to "show (1) that its mark is distinctive,

24

and (2) that the defendant's use of a similar mark has created a likelihood of dilution." Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1209 (1st Cir. 1983) (examining predecessor statute, Massachusetts General laws chapter 110B, section 12);[14] accord Hasbro, Inc. v. Clue Computing, Inc., 66 F.Supp.2d 117, 137 (D.Mass. 1999) (stating same elements); Black Dog Tavern Company, Inc. v. Hall, 823 F.Supp. 48, 59 (D.Mass. 1993) (same). As to the first prong, distinctive marks are synonymous with very strong marks. See S. S. Kresge Co. v. United Factory Outlet, Inc., 598 F.2d 694, 697 (1st Cir. 1979) (noting, in context of chapter 110B, section 12, that "courts have been reluctant to grant exclusive rights, as sought here by appellants, to all but the 'strongest' trade names"). Viewing the evidence in plaintiffs' favor, there is sufficient support for a jury to find that the Drive Marks are very strong and indeed distinctive under chapter 110H, section 13.[15] See generally Pignons S.A. de Mecanique de Precision v.

---

[14] The language of chapter 110H, section 13, is strikingly similar to the language of the predecessor statute, chapter 110B, section 12.

[15] Significantly less evidence is needed to make this finding than to make a finding that plaintiffs will prevail under chapter 110H, section 13, and obtain injunctive relief.

Polaroid Corp., 657 F.2d 482, 494 (1st Cir. 1981) (rejecting lower

court's finding and noting that "Pignons has raised a genuine

issue of fact as to whether the mark 'Alpa' is sufficiently

distinctive to warrant protection under Mass. Gen. Laws Ann. c.

110B, § 12"); Hasbro, Inc. v. Clue Computing, Inc., 66 F.Supp.2d

at 137 (to find distinctiveness under chapter 110B, section 12,

the court "must find that the mark has acquired secondary meaning

or is a strong mark" and the mark was distinctive for purposes of

state dilution statute because court found "the mark has

secondary meaning"); see, e.g., Monteiro Elec., Inc. v. Monteiro

Indus. Elec., Inc., 2008 WL 4926496, *3 (Mass.Super. Oct. 17,

2008).

Turning to the likelihood of dilution, it "can result from

any one of three situations:  (1) reduction of the value of the

mark caused by actual or potential confusion; (2) injury

resulting from a use of the mark that tarnishes the reputation

associated with the plaintiff's mark; or (3) 'diminution in the

uniqueness and individuality of the mark.'"  Hasbro, Inc. v. Clue

Computing, Inc., 66 F.Supp.2d at 137.  As similarly articulated

by the First Circuit in Astra:

> In order to raise a fact issue on likelihood of dilution,
> Astra must produce sufficient evidence to support a finding
> of either (a) injury to the value of the mark caused by

26

actual or potential customer confusion, (b) injury resulting
from use of the mark in a way that detracts from, draws on,
or otherwise appropriates the goodwill and reputation
associated with plaintiff's mark, or (3) diminution in the
uniqueness and individuality of plaintiff's mark.

Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.,

718 F.2d at 1209.  The summary judgment record provides

sufficient evidence to support a finding of potential confusion.[16]

Although the issue is close, there is also sufficient evidence

for a jury to find a diminution in the uniqueness and

individuality of the Drive Marks.  See generally Hasbro, Inc. v.

Clue Computing, Inc., 66 F.Supp.2d at 137 (courts "have looked at

factors such as the similarity of the marks and products, the

renown of the marks, intent, and the relevant consumers" to

assess a diminution in the uniqueness and individuality of the

plaintiff's mark).  Defendants are therefore not entitled to

summary judgment on the chapter 110H claim in Count V.


II.  PLAINTIFFS' RULE 12(C) MOTION (DOCKET ENTRY # 34)

      Plaintiffs move for judgment on the pleadings under Rule

12(c) on Count I (fraud in the procurement), Count III (Sherman

_____

      [16]  The parties do not address preemption and it is
therefore waived for purposes of resolving the pending motion.
See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260
(1st Cir. 1999).

Act) and Count IV (unfair competition) in the counterclaim.  They also move to strike Count II (declaratory relief) in the counterclaim under Rule 12(f).  (Docket Entry # 34).  The district judge previously denied the motion to dismiss (Docket Entry # 13) the above counts filed under Rule 9(b), Fed. R. Civ. P. ("Rule 9(b)"), Rule 12(b)(6), Fed. R. Civ. P. ("Rule 12(b)(6)"), and Rule 12(f).  (Docket Entry # 20).  At the same time, he allowed defendants' motion to amend the counterclaim.  (Docket Entry # 20).


## STANDARD OF REVIEW

A Rule 12(c) motion "is treated much like a Rule 12(b)(6) motion to dismiss."  <u>Perez-Acevedo v. Rivero-Cubano</u>, 520 F.3d 26, 29 (1st Cir. 2008) (citing <u>Curran v. Cousins</u>, 509 F.3d 36, 43-44 (1st Cir. 2007)).  Because a Rule 12(c) "motion calls for an assessment of the merits of the case at an embryonic stage, the court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom" in the nonmovant's behalf.  <u>R.G. Financial Corp. v. Vergara-Nunez</u>, 446 F.3d 178, 182 (1st Cir. 2006).  In order to survive a Rule 12(c) motion, a complaint must contain factual allegations that "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true."  <u>Perez-Acevedo v. Rivero-Cubano</u>, 520

F.3d at 29 (citing <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544 (2007),
as stating standard applicable to Rule 12(b)(6) and "by
extension, a Rule 12(c) motion").  As explained by the Court in
<u>Bell</u>, a complaint must show "a plausible entitlement to relief."
<u>Bell Atlantic v. Twombly</u>, 550 U.S. at 559; <u>accord</u> <u>Rodriguez-Ortiz</u>
<u>v. Margo Caribe, Inc.</u>, 490 F.3d 92, 95 (1st Cir. 2007) (quoting
<u>Bell</u> in context of discussing Rule 12(b)(6) standard of review).

A Rule 12(c) motion, unlike a Rule 12(b)(6) motion,
"implicates the pleadings as a whole."  <u>Aponte-Torres v.</u>
<u>University Of Puerto Rico</u>, 445 F.3d 50, 55 (1st Cir. 2006).  In
evaluating a Rule 12(c) motion, a court may "consider 'documents
the authenticity of which are not disputed by the parties'" as
well as "'documents central to plaintiffs' claim'" and
"'documents sufficiently referred to in the [counterclaim].'"
<u>Curran v. Cousins</u>, 509 F.3d at 44 (internal brackets omitted).
The registrations attached to the complaint therefore form part
of the Rule 12(c) record.  <u>See</u>, <u>e.g.</u>, <u>Id.</u> at 45 n.5.

DISCUSSION

A.  <u>Fraud in the Procurement</u>

Count I sets out a fraudulent procurement claim under the
Lanham Act.  Plaintiffs assert that the claim fails to set out
the necessary elements of causation and damages.

Count I alleges that plaintiffs fraudulently obtained
registrations 414 and 262 because the applications stated that

29

"services under the mark[s] included 'originating loans'" and that DTH "believed that to the best of its knowledge and belief, no other person, firm, corporation, or association has the right to use the marks in commerce." (Docket Entry # 16, Ex. 1, ¶¶ 36-37). "As a result of" such fraudulent activity, defendants have been damaged. (Docket Entry # 16, Ex. 1, ¶ 40). The count identifies damages "[w]ithout limitation" as including not only attorneys' fees and costs associated with the TTAB and Texas proceedings but also harm to defendants' reputations and the loss of investors. (Docket Entry # 16, Ex. 1, ¶ 40).

Section 1120 prescribes that, "Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof." 15 U.S.C. § 1120. In order to prevail on the section 1120 claim, defendants must prove inter alia "damages proximately resulting from" reliance on the misrepresentation. Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 874 (10th Cir. 1995); see also 6 Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31.86 (4th ed. 2008) ("[a]ny damage must be proximately caused by assertion or use of the fraudulently procured registration, not solely from the false declaration"); Hodgdon Powder Co., Inc. v. Alliant Techsystems, Inc., 497

F.Supp.2d 1221, 1234 (D.Kan. 2007).

Plaintiffs argue that attorneys' fees and litigation costs are not recoverable damages under section 1120. (Docket Entry # 35, ¶ III(A)). Entitlement to attorneys' fees or other litigation costs as an element of recoverable damages under section 1120 is an issue of first impression in this circuit. Other circuits addressing the issue uniformly deny litigation costs and attorneys' fees as recoverable damages under section 1120. See Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 876 (8th Cir. 1994) ("fees are not included within damages awarded under Section 38"); Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc., 989 F.2d 985, 991 n.5 (8th Cir. 1993) ("§ 1120 damage claim may not supplant the court's carefully circumscribed discretion to award fees under § 1117"); Exxon Corp. v. Exxene Corp., 696 F.2d 544, 550 (7th Cir. 1982); see also United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1232 (10th Cir. 2000) (noting, in context of discussing award of fees under 15 U.S.C. § 1117, that section "1120 does not allow for the award of attorney fees"); Ritz Hotel, Ltd. v. Shen Mfg. Co., Inc., 2009 WL 1119496, *2 (E.D.Pa. April 27, 2009) ("[l]itigation costs and attorneys' fees are not available as damages under § 38"); Zobmondo Entertainment LLC v. Falls Media LLC, 89 U.S.P.Q.2d 1048 (C.D.Cal. 2008) (section 1120 plaintiffs cannot prove damages element "by alleging that they have been

forced to expend attorneys' fees in defending against [the]
defendants' trademark claims, since attorneys' fees are not
properly part of damages under Section 38, and attorneys' fees
alone thus cannot satisfy damages requirement"); United
Phosphorus, Ltd. v. Midland Fumigant, Inc., 21 F.Supp.2d 1255,
n.5 1259 (D.Kan. 1998) ("attorney fees are not recoverable for
violations of [section 1120]"), aff'd in part and rev'd in part
on other grounds, 205 F.3d 1219 (10th Cir. 2000).  Accordingly,
defendants are not entitled to recover attorneys' fees or defense
costs directly under section 1120.[17]

Plaintiffs' remaining arguments do not provide a basis for
dismissal under Rule 12(c) inasmuch as the count adequately
pleads causation and damages.  The temporal connection with the
fraudulent registrations and the resulting damage to defendants'
reputations and loss of investors is not speculative.[18]
Defendants adequately allege an actual injury to their
reputations and, drawing reasonable inferences in defendants'
favor, their good will.  The allegations that defendants' damages
are the result of the fraudulent registration in Count I together
with the factual allegations and the attached exhibits to the
answer and counterclaim are sufficient to avoid a Rule 12(c)

[17]  It is premature to discuss entitlement to fees under 15
U.S.C. § 1117.

[18]  Plaintiffs do not argue that these damages are not
cognizable under section 1120.

dismissal.

B.  Declaratory Relief

    Plaintiffs next move to strike the declaratory judgment
count under Rule 12(f).  They submit that the declaratory
judgment count "does not serve a useful purpose" and is simply a
"mirror image" of the complaint and duplicates defendants'
affirmative defenses asserting the invalidity and
unenforceability of the Drive Marks.  (Docket Entry # 35).

    Plaintiffs, however, previously raised this exact same
argument as a means to dismiss the declaratory judgment count in
the counterclaim under Rule 12(f).  (Docket Entry # 14, § IV).
In fact, the supporting memorandum used the same language quoted
above as well as a majority of the same cases to present the
argument.  By denying the motion in its entirety and allowing the
motion to amend the answer and to bring the present counterclaim,
the district judge necessarily determined the sufficiency of
Count II under the same Rule 12(f) standard.

    Defendants point out that the present motion "parallels in
many respects their [prior] motion" (Docket Entry # 47) although
they do not expressly request a denial of the motion based on the
law of the case.  Generally speaking, the law of the case
constrains "but does not altogether prohibit[] reconsideration of
orders within a single proceeding by a successor judge."  Ellis
v. United States, 313 F.3d 636, 646 (1st Cir. 2002) (also

33

explaining policies behind prohibition against reconsideration); accord <u>Filbotte v. Pennsylvania Truck Lines, Inc.</u>, 131 F.3d 21, 25 (1st Cir. 1997). With limited exceptions, once legal issues are decided expressly or inferentially, the law of the case precludes relitigation in subsequent stages of the action. <u>See Cohen v. Brown University</u>, 101 F.3d 155, 167-168 (1st Cir. 1996); <u>see also</u> <u>DeWeerth v. Baldinger</u>, 38 F.3d 1266, 1271 (2nd Cir. 1990) (recognizing that law of case doctrine applies to issues decided expressly or by necessary implication); <u>Knotts v. United States</u>, 893 F.2d 758, 761 (5th Cir. 1990) (same).

Because the parties have not had the opportunity to address the law of the case issue as it applies to Count II of the counterclaim, this court refrains from denying the Rule 12(f) motion on this basis with prejudice or on the merits. Rather, this court will deny the motion without prejudice. Plaintiffs may renew the motion as long as they address the law of the case doctrine and provide a basis to overlook the district judge's denial of the same argument under the same standard of review.[19]

---

[19] This court declines to deny the entire motion without prejudice on the basis of the law of the case. First, defendants do not seek to deny the motion on the basis of the law of the case. Second, the present motion as it applies to Count II is more strikingly similar to the prior Rule 12(f) motion and, in the face of the same argument, the district judge allowed the

C. Sherman Act

Count III of the counterclaim sets out a violation of the Sherman Act. In seeking dismissal, plaintiffs contend that the claim fails to overcome the Noerr-Pennington bar and fails to allege the possession of monopoly power. Plaintiffs also argue that trademark misuse is not an independent cause of action.

1. Noerr-Pennington Doctrine

The Noerr-Pennington doctrine shields from antitrust liability entities who petition governmental bodies including the courts for redress. See Davric Maine Corp. v. Rancourt, 216 F.3d 143, 147 (1st Cir. 2000) (citing United Mine Workers v. Pennington, 381 U.S. 657, 670 (1965), and Eastern R.R. Conference v. Noerr Motor Freight, 365 U.S. 127, 135-138 (1961)); Amgen, Inc. V. F. Hoffman-La Roche, Ltd, 480 F.Supp. 462, 469 (D.Mass. 2007) (Noerr-Pennington doctrine "protects the right to petition to governmental bodies"). As one means to avoid Noerr-Pennington immunity, defendants rely on the sham litigation exception.

The sham litigation exception to the Noerr-Pennington doctrine requires:

_____

motion to amend to include the same Count II in the attached counterclaim. Third, the prior Rule 12(b)(6) standard is similar but not identical to the Rule 12(c) standard in the present motion.

> (1) facts sufficient to show that the challenged petitioning
> activity is "objectively baseless" in the sense that "no
> reasonable litigant could realistically expect success on
> the merits"; and (2) facts showing that the petitioner was
> subjectively motivated by an intent to use the act of
> petitioning--as opposed to the legislative or adjudicated
> outcome of the petitioning process--to interfere directly
> with the business relationships of a competitor.

Amgen, Inc. v. F. Hoffmann-La Roche Ltd., 480 F.Supp.2d at 469;

see Professional Real Estate Investors, Inc. v. Columbia Pictures

Industries, Inc., 508 U.S. 49, 60 (1993) ("outlin[ing] a two-part

definition of 'sham' litigation").  Plaintiffs contend that both

prongs are lacking.

Under the objective prong, "If an objective litigant could

conclude that the suit is reasonably calculated to elicit a

favorable outcome, the suit is immunized under Noerr, and an

antitrust claim premised on the sham exception must fail."

Professional Real Estate Investors, Inc. v. Columbia Pictures

Industries, Inc., 508 U.S. at 60.  The objective prong

incorporates "the notion of probable cause, as understood and

applied in the commonlaw tort of wrongful civil proceedings."

Professional Real Estate Investors, Inc. v. Columbia Pictures

Industries, Inc., 508 U.S. at 50 & 60; In re Relafen Antitrust

Litigation, 346 F.Supp.2d 349, 359 (D.Mass. 2004).  Put another

way, "The existence of probable cause to institute legal

proceedings precludes a finding that an antitrust defendant has engaged in sham litigation." _Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc._, 508 U.S. at 62. Consequently, when a court finds that a Sherman Act defendant "claiming _Noerr_ immunity had probable cause to sue, that finding compels the conclusion that a reasonable litigant in the defendant's position could realistically expect success on the merits of the challenged lawsuit." _Id._ at 63.  Probable cause amounts to "no more than 'reasonable belief that there is a chance that a claim may be held valid upon adjudication.'" _Id._ at 62-63 (internal brackets omitted).

The second prong is subjective.  It focuses "on whether the baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor.'" _Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc._, 508 U.S. at 60-61.  This prong prescribes the "use of the governmental process--as opposed to the outcome of that process-- as an anticompetitive weapon." _Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc._, 508 U.S. at 61 (internal brackets omitted).

As set out in the counterclaim, DTH knew or should have known about the rightful use of the term drive by others in

commerce.  (Docket Entry # 16, Ex. 1(B)).  More significantly,

plaintiffs instituted suit in the Texas court where jurisdiction

against Walsh and the Drive USA defendants was obviously lacking

on May 20, 2008.  They resorted to the Texas court after

litigating in the TTAB proceeding opposing the application for

the DriveUSA mark for two years and then voluntarily dismissed

the action "on the day of trial."[20]  (Docket Entry # 16, Ex. 1, ¶¶

31-33).

In addition, at the time DTH filed the March 2005

application that led to registration 414 and the August 2004

application that led to registration 262 "multiple other persons,

firms, corporations, or associations had the right to use the

term DRIVE as a trademark in commerce, including in relation to

automobile financial services."  (Docket Entry # 16, Ex. 1, ¶ 7).

Moreover, plaintiffs have initiated "other proceedings seeking

unfairly and illegally to oppress other rightful trademark users

and to expand whatever rights they might have in their marks with

full knowledge of rightful and prior uses of the term DRIVE by

---

[20]  "A winning lawsuit is by definition a reasonable effort
at petitioning for redress and therefore not a sham."
Professional Real Estate Investors, Inc. v. Columbia Pictures
Industries, Inc., 508 U.S. at 61 n.5.  An unsuccessful lawsuit,
however, is not necessarily a sham unless the action was
"'unreasonable or without foundation.'"  Id.

others in relation to automobile services." (Docket Entry # 16, Ex. 1, ¶ 16). Although the showing is not overwhelming, the foregoing facts as well as other facts in the record and reasonable inferences in the pleadings and attached documents provide a plausible entitlement to avoid the Noerr-Pennington bar.[21] See, e.g., Alternative Electrodes, LLC v. Empi, Inc., 597 F.Supp.2d 322, 326 & 330-331 (E.D.N.Y. 2009) (denying motion to dismiss given sufficient facts alleged to show sham litigation including using lawsuits to threaten competitors encompassing the plaintiff, initiation of objectively unreasonable infringement lawsuit against the plaintiff and dismissal without payment); In re Gabapentin Patent Litigation, 649 F.Supp.2d 340, 364 (D.N.J. 2009) (denying motion to dismiss because "adequately alleged facts, which, if proven, will show that Warner-Lambert's Capsule and Tablet Lawsuits are not entitled to Noerr-Pennington immunity under the sham litigation exception").

2.  Monopoly Power

Plaintiffs also attack the Sherman Act count as failing to set out a section two Sherman Act claim because defendants do not define the relevant market. If the market is automobile

---

[21]  Accordingly, it is not necessary to address the fraud exception to Noerr-Pennington immunity.

financing services, they further contend that defendants fail to allege the possession of monopoly power.

Section two proscribes monopolization and attempts to monopolize. 15 U.S.C. § 2. A plaintiff asserting a section two monopolization claim must show "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." The Hertz Corp. v. Enterprise Rent-A-Car Co., 557 F.Supp.2d 185, 193 (D.Mass. 2008); United States v. Grinnell Corp., 384 U.S. 563, 571 (1966). A monopolization claim therefore requires the plaintiff to show "that the defendant has monopoly power in the relevant market." Boston Scientific Corp. v. Schneider (Europe) AG, 983 F.Supp. 245, 268 (D.Mass. 1997).

An attempted monopolization claim requires the plaintiff to "prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993). In an attempted monopolization claim, the plaintiff must therefore show inter alia "that the defendant had the specific intent to

monopolize the relevant market." <u>CVD, Inc. v. Raytheon Co.</u>, 769

F.2d 842, 851 (1st Cir. 1985); <u>see</u> <u>Boston Scientific Corp. v.</u>

<u>Schneider (Europe) AG</u>, 983 F.Supp. at 268.

In short, "'Defining the market is a necessary step in any

analysis of market power and thus an indispensable element in the

consideration of any monopolization or attempt case arising under

section 2.'" <u>Pacamor Bearings, Inc. v. Minebea Co., Ltd.</u>, 892

F.Supp. 347, 354 (D.N.H. 1995) (quoting <u>U.S. Anchor Mfg., Inc. v.</u>

<u>Rule Industries, Inc.</u>, 7 F.3d 986, 994 (11th Cir. 1993), in

parenthetical); <u>see</u> <u>George R. Whitten, Jr., Inc. v. Paddock Pool</u>

<u>Builders, Inc.</u>, 508 F.2d 547, 550 (1st Cir. 1974) ("a section 2

attempt case, like a monopolization case, requires a definition

of the relevant market").  The relevant market "is composed of

(1) the product market and (2) the geographic area involved."

<u>Curtis Mfg. Co., Inc. v. Plasti-Clip Corp.</u>, 888 F.Supp. 1212,

1231 (D.N.H. 1994); <u>see</u> <u>Ticket Center, Inc. v. Banco Popular de</u>

<u>Puerto Rico</u>, 613 F.Supp.2d 162, 178 (D.P.R. 2008) (the plaintiff

has "burden to define the relevant geographic market and product

market").  In order to withstand a motion to dismiss, the

defendant must allege that the plaintiff "possesses an illegally

acquired monopoly power in some relevant geographic and product

market." <u>DJ Mfg. Corp. v. Tex-Shield, Inc.</u>, 275 F.Supp.2d 109,

118 (D.P.R. 2002).

"The relevant product market generally consists of products that have reasonable interchangeability for the purposes for which they are produced, taking into consideration price, use and quality." Eastern Food Services, Inc. v. Pontifical Catholic University of Puerto Rico Service Ass'n, Inc., 222 F.Supp.2d 131, 135 (D.P.R. 2002) (internal quotation marks omitted); see Sterling Merchandising, Inc. v. Nestle, S.A., 2010 WL 2573874, *6 (D.P.R. June 23, 2010) ("Supreme Court case law establishes that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it"); see generally 6 Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31.97 (4th ed. 2008) (recognizing that the "trademark does not define its own relevant economic market"). Indulging reasonable inferences of fact in defendants' favor, a fair reading of the counterclaim depicts the relevant market as "automobile financial services." (Docket Entry # 16, Ex. 1, ¶¶ 8, 9, 16, 17, 18, 27 & 49). Defendants' answers to interrogatories may further refine the market to dealer originated automobile financing services but, for present purposes, the counterclaim adequately sets out the product market

to withstand a Rule 12(c) dismissal.  See generally Todd v. Exxon Corp., 275 F.3d 191, 200 (2nd Cir. 2001) ("courts hesitate to grant motions to dismiss" given that "market definition is a deeply fact-intensive inquiry").

The relevant geographic market is "'the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product.'" Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196 (1st Cir. 1996); see U.S. v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956); Eastern Food Services, Inc. v. Pontifical Catholic University of Puerto Rico Service Ass'n, Inc., 222 F.Supp.2d at 135.  Except for describing plaintiffs as having a "'$4 billion non-prime auto portfolio'" (Docket Entry # 16, Ex. 1, ¶ 16), there is little to indicate the relevant geographic market in the counterclaim.

In lieu of dismissing Count III on this basis, however, this court will afford defendants 30 days to file a motion for leave to amend the counterclaim to allege the relevant geographic market.  See generally Rodi v. Southern New England School of Law, 389 F.3d 5, 20 (1st Cir. 2004) (setting out appropriate circumstances to allow leave to amend in the course of allowing a motion to dismiss); Eastern Food Services, Inc. v. Pontifical

Catholic University Services Ass'n, Inc., 357 F.3d 1, 8 (1st Cir. 2004) (same). Because the court previously allowed defendants leave to amend, defendants shall confine the amendment to adding a paragraph[s] relative only to the geographic market and, if necessary, a further refinement of the product market. Defendants shall not use this as an opportunity to amend or alter allegations relative to any other claim.

3. Trademark Misuse

Plaintiffs also move to dismiss Count III insofar as it sets out a cause of action of trademark misuse. Defendants submit that a cause of action for trademark misuse is proper.

It is well settled that "trademark misuse is purely an affirmative defense and does not form the basis for an affirmative claim for recovery." 6 Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31.44 (4th ed. 2008) (comma omitted). Caselaw allows trademark misuse as an affirmative defense but not as an independent cause of action. See Dunn Computer Corp. v. Loudcloud, Inc., 133 F.Supp.2d 823, 831 (E.D.Va. 2001) ("[a]uthority is uniform in allowing trademark misuse only as an affirmative defense to a trademark infringement action"); see also Whitney Information Network, Inc. v. Gagnon, 353 F.Supp.2d 1208, 1212 (M.D.Fla. 2005) ("courts uniformly allow

44

trademark misuse only as an affirmative defense to a trademark infringement action"); <u>Ford Motor Co. v. Obsolete Ford Parts, Inc.</u>, 318 F.Supp.2d 516, 521 (E.D.Mich. 2004) (declining "to announce or create an independent cause of action for trademark misuse and find[ing] that [the] Defendant's claim is more appropriately cast as a potential affirmative defense" while also questioning the viability as an affirmative defense).

In addition, the Lanham Act provides that "conclusive evidence of the right to use the registered mark shall be subject to the following defenses or defects . . . (7) That the mark has been or is being used to violate the antitrust laws of the United States."  15 U.S.C. § 1115(b)(7) ("section 1115(b)(7)").[22]  The silence of the Lanham Act as creating a trademark misuse independent cause of action when a registered mark is being used to violate the antitrust laws is telling.

Count III of the counterclaim is therefore dismissed to the extent it states a trademark misuse cause of action.

_____

[22]  The language and "legislative history reveal that the effect of this section is merely to make the defense of antitrust misuse available to defeat the conclusive evidentiary force that would otherwise attach to a federal registration."  6 Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 31.92 (4th ed. 2008); <u>see</u> <u>Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena</u>, 298 F.Supp. 1309, 1312 (D.C.N.Y. 1969) (detailing legislative history of section 1115(b)).

D.  <u>Unfair Competition</u>

With respect to Count IV, plaintiffs seek dismissal of the
section 11 chapter 93A claim.  They argue that the alleged "fraud
in the procurement of trademark registration does not involve a
commercial transaction between the partes."  (Docket Entry # 35,
§ VI).  Citing Milliken & Co. V. Duro Textiles, LLC, 887 N.E.2d
244 (Mass. 2008), they also maintain that litigation itself does
not "constitute 'trade or commerce'" within the purview of
chapter 93A.  (Docket Entry # 35, § VI).

Whether liability under section 11 of chapter "93A applies
to an 'interaction between two parties'" requires a threshold,
"'dual inquiry.'"  States Resources Corp. v. The Architectural
Team, Inc., 433 F.3d 73, 84 (1st Cir. 2005) (quoting Linkage Corp.
v. Trustees of Boston University, 679 N.E.2d 191, 206-207 (Mass.
1997)); accord Linkage Corp. v. Trustees of Boston University,
679 N.E.2d at 206-207 ("applicability of G.L. c. 93A, §§ 2(a) and
11, to interaction between two parties requires a dual inquiry").
"'[F]irst, the court assesses whether the interaction is
"commercial" in nature, and second, it evaluates whether the
parties were both engaged in "trade or commerce," and therefore
acting in a "business context."'"  States Resources Corp. v. The
Architectural Team, Inc., 433 F.3d 73, 84 (quoting Linkage Corp.
v. Trustees of Boston University, 679 N.E.2d at 206-207); see
Milliken & Co. v. Duro Textiles, LLC, 887 N.E.2d at 259 (section

11 requires "dual inquiry whether there was a commercial transaction between a person engaged in trade or commerce and another person engaged in trade or commerce, such that they were acting in a 'business context'").

Although plaintiffs argue that the lack of a commercial transaction directly "between them" is fatal to the section 11 claim, the First Circuit in a post-Milliken case disagreed where, as here, the claim is a fraud suit under section 11. See In re Pharmaceutical Industry Average Wholesale Price Litigation, 582 F.3d 156, 192-193 (1st Cir. 2009). Defendant AstraZeneca Pharmaceuticals LP ("AstraZeneca") argued that it did not have privity with third party payors ("TTPs") in a Medicare fraud suit because it did not directly interact with TTPs, a group that included insurance plans such as plaintiff Blue Cross Blue Shield of Massachusetts ("BCBS") which reimbursed Medicare beneficiaries for co-payments based on a drug's average wholesale price ("AWP"), a price that AstraZeneca purportedly inflated by not including kickbacks offered to physician providers. See In re Pharmaceutical Industry Average Wholesale Price Litigation, 582 F.3d at 161-162 & n.4 & 5. Examining Massachusetts appellate court cases, the Pharmaceutical court explained "that, in a fraud suit under § 11 where 'the parties are engaged in more than a minor or insignificant business relationship,' such privity is not required." In re Pharmaceutical Industry Average Wholesale

Price Litigation, 582 F.3d at 193.  The Pharmaceutical court
thereby affirmed section 11 liability because of AstraZeneca's
manipulation of the inflated AWP pricing scheme with
misrepresentations about the cost of its drug, Zoladex, in a
manner that it knew or should have known would increase BCBS's
payments and AstraZeneca's orchestration of a fraudulent scheme
at the cost of TTPs.  Id. at 193-194.  The fact "[t]hat the fraud
passed through third parties along the way does not reduce or
undo the influence AstraZeneca wielded over the plaintiffs'
transactions, an influence so great as to make AstraZeneca and
the plaintiffs a kind of functional counterparties."  Id.  In
short, the lack of privity was not an obstacle because the
parties engaged in more than a minor or insignificant
relationship.

Here too, defendants allege a fraudulent scheme under which
plaintiffs engaged in misrepresentations, particularly with
regard to the applications that led to registrations 414 and 262,
before the PTO that they knew or should have known would restrict
defendants' rightful use of the drive term and/or the rightful
use by others of the term in relation to automobile financing
services thereby unfairly harming defendants and others.  The
amended complaint also reasonably infers that the fraud by
plaintiffs before the PTO significantly influenced the ability of
defendants to capitalize on their drive term and to engage in the

48

transactions between defendants and its dealer partners and/or the automobile financing purchasers at such dealerships. (Docket Entry # 16, Ex. 1). A Rule 12(c) dismissal based on the argument of a lack of commercial transaction between plaintiffs and defendants is not warranted.

Turning to the litigation argument, it is true, as plaintiffs point out, that the Milliken court states that, "[W]e have held that 'the mere filing of litigation does not of itself constitute "trade or commerce."'" Milliken & Co. v. Duro Textiles, LLC, 887 N.E.2d at 260 (quoting First Enters., Ltd. v. Cooper, 680 N.E.2d 1163 (Mass. 1997), citing Arthur D. Little, Inc. v. East Cambridge Sav. Bank, 625 N.E.2d 1383 (Mass.App.Ct. 1994)). This aspect of the dual inquiry addresses the second part, to wit, whether the parties engaged in "trade or commerce" and were therefore acting in a business context. Id. at 260; see also Stop & Shop Supermarket Co. v. Loomer, 837 N.E.2d 712, 717-718 (Mass.App.Ct. 2005). It takes place "only after it has been established that a 'commercial transaction' exists." See also Stop & Shop Supermarket Co. v. Loomer, 837 N.E.2d at 717. Plaintiffs and defendants, however, were undeniably acting in a business context in the course of registering and asserting their marks. See generally Milliken & Co. v. Duro Textiles, LLC, 887 N.E.2d at 260 (discussing and applying the business context test discussed in Begelfer v. Najarian, 409 N.E.2d 167, 175-176 (Mass. 1980)).

In any event, the fraud extends beyond the litigation between the parties.  Cf. Arthur D. Little, Inc. v. East Cambridge Sav. Bank, 625 N.E.2d at 1389 ("allowing summary judgment because "[n]o commercial relationship ever existed between the parties; their only contact occurred in the context of this litigation").  The misconduct at issue involves the commercial interactions between the parties as competitors and as users of the drive term in providing automobile financing services.  Accordingly, the filing of litigation argument does not provide a basis for a Rule 12(c) dismissal of Count IV.

Finally, in opposing dismissal of the section 11 claim, defendants address an argument *not* raised by plaintiffs in the present filing, i.e., that the misconduct did not take place "primarily and substantially" in Massachusetts.  (Docket Entry # 47).  Plaintiffs raised the argument in the previous Rule 12(b)(6) motion (Docket Entry # 14, § VI), which the district judge summarily denied (Docket Entry # 20), but they do not raise it in the current Rule 12(c) motion.  Accordingly, it is not necessary to address the argument.  As an aside, however, this court points out that the Pharmaceutical court addressed and rejected an argument that the misconduct of AstraZeneca, which had a principal place of business in Delaware and a business "directed nationwide" with "none of the pricing compendia" located in Massachusetts, did not occur "primarily and substantially within" Massachusetts.  In

re Pharmaceutical Industry Average Wholesale Price Litigation, 582
F.3d at 194.


## CONCLUSION

Accordingly, the motion for summary judgment (Docket Entry #
37) is **DENIED**.  The motion to dismiss (Docket Entry # 34) is

**DENIED** except:  (1) it is denied without prejudice as to setting
forth the relevant geographic market in Count III of the
counterclaim; (2) attorneys' fees as an element of recoverable
damages under Count I of the counterclaim are **DENIED**; and (3)

**ALLOWED** to the extent that any trademark misuse cause of action in
Count III is dismissed.  Defendants may seek leave to amend Count
III of the counterclaim to set forth the relevant geographic
market within 30 days.  The parties shall appear for a status
conference on December 10, 2010, at 2:30 p.m.


    /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge